[Cite as *State v. Lathan*, 2024-Ohio-2514.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                    Court of Appeals No.  L-23-1036

     Appellee                                               Trial Court No.  CR0202102711

v.

Darryl Lathan, II                                          **DECISION AND JUDGMENT**

     Appellant                                              Decided:  June 28, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Megan M. Patituce, Joseph C. Patituce, and
Catherine Meehan, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Darryl Lathan, II, appeals the

January 20, 2023 judgment of the Lucas County Court of Common Pleas, convicting him

of murder and felonious assault, with firearms specifications, and failure to comply with

an order or signal of a police officer.  For the following reasons, we affirm the trial court

judgment.

# I. Background

{¶ 2} Darryl Lathan was charged in a three-count indictment in connection with the May 16, 2021 shooting death of A.R. He entered a plea of guilty to Count 3, failure to comply with an order or signal of a police officer, a violation of R.C. 2921.331(B), (C)(1), and (C)(5)(a)(i). The remaining counts—Count 1, murder, a violation of R.C. 2903.02(B) and 2929.02, and Count 2, felonious assault, a violation of R.C. 2903.11(A)(1) and (D), and firearms specifications under R.C. 2941.145(A)(B)(C) and (F)—were tried to a jury in August of 2022.

{¶ 3} The State presented the testimony of Toledo Police Lieutenant Philip Cook; Officers Daniel Welch and Bradley Knapp; Sergeant Aaron Riter; Detectives Scott Mills, Kristi Eycke, and Jeffrey Sharp; University of Toledo Police Officer John Sawicki; Lucas County Deputy Coroner Jeffrey Hudson, M.D.; and A.R.'s brother, D.D. Lathan testified, and he presented the testimony of his cousin, D.G., and his brother, C.J. There were video cameras monitoring multiple angles at businesses near the scene of the shooting and at the hospital where the victim was taken, and there were dashboard cameras in the police vehicles and in the car Lathan drove that night. Extensive video footage was therefore admitted into evidence.

## A. The State's Evidence

{¶ 4} According to the evidence presented by the State, sometime after midnight on May 16, 2021, A.R., D.D. (nicknamed Pooter), and a group of their friends went to the Spotlight Lounge, a nightclub located at the corner of Angola and Reynolds Roads. The

2.

club was very crowded when they got there, so they could not get inside. People socialized and drank in the parking lot while waiting to be admitted into the club. Traffic in the parking lot moved slowly, often stopping altogether.

{¶ 5} About 20 minutes after A.R. and his group got to Spotlight, Lathan arrived with a group of friends and relatives, including C.J. and E.W. He arrived in a BMW that pulled up behind a Jeep that was stopped near the door of the club. A maroon sedan was stopped to the left of the Jeep.

{¶ 6} Lathan and A.R. knew each other because they grew up in the same neighborhood, but they were not friends. To the contrary, they had been at odds with each other for several years and had argued over Facebook. D.D. claimed that when A.R. noticed that Lathan was there, he told D.D. that he wanted to leave. A.R. then walked away, but D.D. did not know where he went.

{¶ 7} Video shows that the driver of the BMW tried to reverse shortly after arriving at Spotlight, but other cars were lined up behind the vehicle, preventing it from going very far. The BMW stopped and its occupants exited the vehicle. Some of them approached and greeted people that they knew. Lathan's friend, E.W., knew D.D. from playing sports together in school, and they stopped and talked to each other towards the front passenger side of the vehicle.

{¶ 8} A.R. had been wearing a mask that night, similar to a ski mask or ninja mask, but initially it was pushed up on his head holding back his dreadlocks. At some point, he pulled the mask down to cover his face. Video cameras recorded a masked A.R.

3.

grab a gun out of a fanny pack, cock it, and walk around the maroon sedan and Jeep that were stopped immediately in front of the BMW. Lathan was standing at the driver side door of the BMW. As A.R. walked around the side of the Jeep, Lathan shot at A.R. and struck him, then ran away from Spotlight and across Reynolds Road.

{¶ 9} A.R. stumbled past the door of the club and fell, dropping the gun. D.D. was holding a bottle of Patron, which he threw in Lathan's direction. E.W. got into the BMW. D.D. ran back towards A.R., grabbed his gun off the sidewalk, and started running in the direction where Lathan ran. As he passed the BMW, he shot into it, shot back towards it again, ran through the parking lot, then ran back towards Spotlight; D.D. estimated that he shot the gun four times. E.W. was struck by one of the bullets D.D. fired at the BMW. D.D. recalled that as he ran past the BMW, he heard other shots being fired. He did not know if Lathan continued firing as he ran away. D.D. maintained that someone took the gun from him as he was leaving Spotlight.

{¶ 10} A.R. and E.W. were transported by their friends to the University of Toledo Medical Center. Lathan was picked up in the BMW at the corner of South Avenue and Reynolds Road and accompanied E.W. to the hospital. Videos outside the emergency room entrance show that D.D. and Lathan encountered each other there and engaged in a physical altercation that was quickly broken up by law enforcement. D.D. told Lathan, "you're going to die tonight, bitch."

{¶ 11} Once they were separated, Lathan took off in the BMW. Toledo Police Officers attempted to stop Lathan's vehicle, but he led them on a high-speed chase that

4.

ended when his vehicle hit a rock at Rock Spring and Glen Ridge Roads. Lathan got out of the car and fled on foot, but was easily identified because he left a wallet with his credit cards and state identification in the driver's side panel of the BMW. Police also found keys with the first name of Lathan's mother on them, a cell phone that contained email addresses associated with Lathan, and a gun holster on the floor of the front passenger seat. When the vehicle was processed at the impound lot, bullet defects were discovered in the right front bumper of the vehicle, windshield, left rear quarter panel, left front door frame, B pillar of the front left side, and middle armrest. A bullet core was found in the upper decking of the rear window and a fragment of bullet jacketing was found on the floor of the back seat.

{¶ 12} An autopsy revealed that A.R. suffered a superficial gunshot wound that grazed his right ring finger; a gunshot wound that entered the back of his right leg and exited above the knee, fracturing his femur; and a gunshot wound that entered the upper left side of his back near his armpit and exited through his chest. The gunshot wound to his back went through the left ventricle of his heart and caused his death.

{¶ 13} E.W.'s gunshot wound was not fatal. D.D. was charged with felonious assault with a firearms specification for E.W.'s shooting, but ultimately entered into a plea agreement with the state. Under that agreement, D.D. entered a plea of guilty to felonious assault, the firearms specification was dismissed, and D.D. agreed to provide truthful testimony at Lathan's trial. D.D. denied that he intentionally shot E.W.

5.

{¶ 14} Investigators who processed the scene on the night of the shooting observed five vehicles in the Spotlight parking lot; three of the five had been damaged by bullets. The windshield of a Jeep was struck by a bullet. The bullet lay on the dashboard of the vehicle. An Acadia was struck by bullets twice in the front bumper, and a Chrysler 300 had two bullet defects in the windshield. Investigators found the identification of Lathan's brother, C.J., in the Acadia, and the vehicle was registered to Lathan's mother.

{¶ 15} Numerous shell casings and bullets were also found in the parking lot. In all, 27 casings were collected. There were eight casings and one live round of ammunition clustered in the same general vicinity near a light post. There was another cluster of ten shell casings in front of where the Acadia was stopped, and a couple more nearby. Additional spent bullets, bullet fragments, and jackets were also found. No casings were found in the area where A.R. was standing, but because it was a crowded scene, casings could have moved around as a result of being kicked as people ran or lodged in tires as people drove off. All the live rounds and spent casings came from nine-millimeter weapons. It was determined that the casings collected were fired from three different firearms. None of the firearms were recovered. Some of the shell casings were matched to two other separate shooting incidents in Toledo, but firearms were never located in those cases either and there were no victims in those other shootings. None of the witnesses interviewed ever identified any shooters at the scene other than Lathan and D.D.

6.

{¶ 16} Investigators interviewed witnesses, collected fingerprints, and swabbed various items for DNA. Many witnesses refused to cooperate. In fact, E.W. provided false statements to police when he was first interviewed in this case and was charged with obstruction. Investigators also used cell phone data to confirm that Lathan was in the vicinity of Spotlight at the time of the shooting and was in the vicinity of Rock Spring and Glen Ridge around the time the pursuit of the BMW terminated.

{¶ 17} Cross-examination focused on whether A.R. raised his gun to shoot, whether there were shots fired by individuals other than Lathan and D.D., and whether A.R., D.D., and a man referred to as Brown Hat signaled each other in an effort to set Lathan up to be shot. D.D. denied that he and Brown Hat signaled to each other, but he conceded that in the video of the incident, (1) it appeared that Brown Hat signaled to A.R., and (2) A.R. appeared to have raised his gun when he got to the side of the Jeep. D.D. admitted knowing that A.R. had a gun on him, but denied seeing it out that night. In fact, at the time shots were fired, D.D. believed his brother was still in front of the Jeep; he did not know that he had walked behind the cars and rounded the right side of the Jeep. D.D. insisted that he did not act in concert with anyone to try to kill Lathan.

{¶ 18} Although numerous angles were recorded by the BMW's dash cam and various surveillance cameras in the area, none of the cameras perfectly captured all the participants' movements.

7.

## B. Lathan's Version of Events

{¶ 19} Lathan did not deny that he shot A.R., but he claimed that he did so in self-defense. He presented testimony from D.G. and C.J., then testified in his own defense.

### 1. Lathan's Cousin, D.G.

{¶ 20} D.G. testified that he was at Spotlight that night. He walked out to his car to get his vape pen and discovered that Lathan and other relatives were there. At first Lathan was sitting on the edge of the car door. He got out and D.G. and Lathan shook hands. D.G. saw A.R. and D.D. He considered them to be friends. He denied being aware of any animosity between A.R. and Lathan.

{¶ 21} D.G. saw that one of his female cousins was talking to D.D., and he stopped and spoke with them. D.G. and D.D. walked toward the door of the club. At some point, A.R. and D.D. were at the door near him, and they were staring at Lathan; A.R. was not wearing a mask at that time. D.G. described that things did not seem hostile at first, but he felt the mood change. People were "talking amongst each other and pointing a certain way." He said that because he felt tension, he told everyone to "chill" and that they were "all family tonight."

{¶ 22} Although he did not know what was going on, D.G. said that he "knew [he] needed to get out of there." He testified that he was scared and wanted to get out of the way. While standing near the door to the club, he raised his arm to try to get C.J.'s attention because he felt that something was about to happen and he wanted to warn C.J. to "get out of the way." He said he tried to call C.J., but C.J. did not have his phone. As

8.

D.G. pulled on the door to go back inside, shots were fired; he denied that he pointed at A.R. before the shots were fired. He insisted that he did not see the shooter and did not see anyone with a gun.

## 2. Lathan's Brother, C.J.

{¶ 23} C.J. testified that he drove to Spotlight that evening in his mother's GMC Acadia. Before going to Spotlight, he, Lathan, E.W., and other friends had been at another club. He followed the BMW that Lathan was riding in. The parking lot was crowded and traffic was moving slowly. His vehicle was at a complete stop; they tried to reverse but they were blocked in by other vehicles. They got out of the vehicle and said hi to people they knew.

{¶ 24} After being there a few minutes, C.J. saw somebody with a gun and a mask, so he started walking the opposite way. He felt fearful for the other people he was with. As he walked to his car, he heard gunshots and hid behind the car. He heard more than ten shots, but did not see the shots being fired. He felt bullets fly by him and hit off the car next to him. He ran towards a field on Reynolds Road and left his car and cell phone at Spotlight. He never looked back after the shots were fired, and he never returned to make sure that his family was okay.

{¶ 25} C.J. denied knowing that A.R. or D.D. was going to be at the club. He denied knowing that Lathan had a gun that night and did not see him with a gun.

9.

### 3. Lathan

{¶ 26} Lathan testified that he and A.R. knew each other from their neighborhood and grew up together. A.R. was two years younger than Lathan. Lathan denied that he had a problem with A.R., but claimed that A.R. had a problem with him. A.R. made threats about Lathan in a music video. A.R. also had others tag Lathan in social media posts. People told Lathan that A.R. was going to kill him when he saw him.

{¶ 27} A.R. had been threatening Lathan for a while, so at first, Lathan did not take it seriously. Eventually, Lathan felt threatened. Lathan explained that like D.D., he also goes by the nickname "Pooter." He testified that A.R. made a song with lyrics stating that Pooter "better kill [A.R.] before [he] end[s] up dead," and A.R. also said he was going to rob and shoot Lathan. Lathan claimed that A.R. had a reputation for violence and he is personally aware that A.R. has shot multiple people. He claimed that he feared A.R. and he feared him the night that they were at Spotlight.

{¶ 28} Lathan arrived at Spotlight in a BMW; E.W. and R. rode with him. His brother arrived behind him in an SUV. The traffic moved slowly. Lathan saw a friend from his neighborhood named Chewy, and Lathan hung out the window to get his attention. Chewy did not come over to talk to him, and this seemed unusual. Chewy leaned in the car ahead of the BMW, looked back at Lathan, gave him a sour look, then shook his head. Lathan then saw A.R. walk out of the club; he was smiling and looked like he was trying to say something to Chewy. A.R. looked over at Lathan and his smile faded. A.R. was not wearing a mask at that point. He disappeared into the parking lot.

10.

**{¶ 29}** Lathan wanted to leave. There was a car ahead of the BMW blocking it in, and he told them to move, but could not get through. His brother also attempted to back the SUV out, but the cars behind him prevented them from leaving the line of cars.

**{¶ 30}** Unable to leave, Lathan remained in the car at first. His cousin came up to him and hugged him and told him to be careful. Lathan claimed that people started telling him that "they about to shoot your car up." People told him "get your dumb ass out of the car," so he got out by climbing out the window.

**{¶ 31}** Lathan maintained that before going to Spotlight, he was not armed with a weapon and there was no weapon in the vehicle. But while he was hanging out of the window, someone asked him if he was "strapped." He said no. He claimed that as he scanned the parking lot for A.R., "a gun end[ed] up on [his] lap, like somebody must have stuffed it" in his lap. He did not know who did this because the music was loud and he was not paying attention at the time.

**{¶ 32}** Music was playing in the parking lot, and Lathan danced around in front of the car a little, still looking for A.R. over the cars. He walked the "peripher[y]" of the car because he knew A.R. was "about to pop out of somewhere." A.R. and D.D's friends approached Lathan, so he walked towards them. D.D. is usually neutral when it comes to Lathan and they usually talk when they see each other. The group shook hands with each other.

11.

{¶ 33} Brown Hat shook his hand, but Lathan said that Brown Hat does not like him. He could see that Brown Hat was carrying a gun on his hip. After shaking Lathan's hand, Brown Hat and his group kept walking and disappeared into the parking lot.

{¶ 34} Lathan became fearful that he was being set up. One of the people in that group had told Lathan that A.R. was going to kill Lathan when he saw him. He felt that A.R.'s group was "trying to distract [him] while [A.R.] pop up from wherever he popping up from." Lathan shifted to the left and looked for A.R. between the cars.

{¶ 35} Lathan saw three of A.R.'s friends. One was sitting on a car, dressed in black, and "masked up." He had a gun. Another of A.R.'s friends was "crouched down with a mask on" looking at Lathan from the back of the car. He did not know the third man, but he recognized the other two "from the neighborhood." Lathan testified that these men were known for shooting people.

{¶ 36} Lathan felt stuck. He wanted to run, but he couldn't because that also would have been dangerous. Also, his wallet and phone were in the car. He turned back around to tell his friends to watch out and pay attention because A.R. would not have any problem shooting them. As he was going back, A.R. "finally pop out from between the cars where the two other people with guns was." A.R. had a mask on and a gun in his hand. They looked directly at each other. Lathan claimed that everyone was looking at him because they knew what A.R. was about to do.

{¶ 37} Lathan hoped that D.D. or one of his friends would get A.R., but A.R. walked to his left in front of the car and continued to walk. C.J. and E.W. were in that direction

12.

talking to D.D. Lathan tried to tell them to get out of the way because A.R. was going to shoot them all. A.R. was trying to get into position to shoot him, and A.R.'s friends were already in position to do so. Lathan was trying to watch all of them. His gun was not yet out. But then, A.R. walked to the curb, peeked back at Lathan, and raised the gun. Lathan was 100 percent certain that A.R.'s gun was cocked. Lathan "hurried up and shot."

{¶ 38} A.R. would not have seen Lathan's gun because it wasn't out. Lathan hurried up, raised it, and shot. He had recently had shoulder surgery, so he knew it was going to hurt to raise the gun. Lathan claimed he fired it twice. He insisted that A.R.'s gun went off too because he saw bullets fly out. He pointed out in the video where he saw A.R.'s gun spark and identified where he saw smoke from the gun. Lathan maintained that two other people shot at him as well, and he pointed out in the video where the other shooters were located.

{¶ 39} Lathan described that A.R. kind of ran, tripped over the curb, and went flying. Lathan "ducked off" running, dodging A.R.'s shots, but he did not run instantly because guns were pointed at his face. He ran towards Reynolds Road, all the while hearing "shots going nonstop." He ran across Reynolds, climbed over a gate, then ran into a trailer park. Lathan said that the gun fell out of his hand sometime when he was running. He lost his glasses too.

{¶ 40} Lathan believed he had been struck by a bullet. His friend, R., ran across Reynolds too and ran past Lathan. Lathan called his name and R. checked Lathan and determined that he had not been shot. E.W. called R.—Lathan's phone was still in the car.

13.

E.W. said he had been shot; Lathan assumed that A.R. had shot him, but E.W. told him it was Pooter (i.e., D.D.). R. ran back to get E.W. and Lathan stayed hiding. R. came back in the BMW to pick up Lathan and they drove E.W. to the hospital.

{¶ 41} When they got to the hospital, the doors were locked. D.D. and his group were inside the hospital, which confused Lathan because he did not know that anyone in D.D.'s group had been shot. He just thought that A.R. had fallen over the curb.

{¶ 42} Lathan and D.D. faced off at the door. The door opened from the inside. When it opened, Lathan put his hands up to fight, and so did D.D. D.D. swung at him and bumped him. Lathan could not fight back because of his shoulder injury. He was in pain and he started running away from him. Police officers eventually grabbed D.D.

{¶ 43} An officer's body camera recorded Lathan tell R. to get D.D. D.D. yelled at Lathan that he was going to kill Lathan and Lathan would die that night. Lathan and R. were outnumbered and D.D. kept breaking free from police. Although Lathan did not see any guns, he knew that people had guns. Lathan told E.W. to go inside and he went to the driver's seat of the BMW and told R. to come with him because he was going to get "fuck[ed] up." R. didn't come, so Lathan just left. He insisted that he left not because he had just fired a weapon at Spotlight, but because he was afraid for his life. He thought D.D.'s group would start shooting. Lathan said he eventually realized that police were chasing him and he regrets not stopping. He pled guilty to charges stemming from the police chase.

14.

**{¶ 44}** Lathan claimed that he did not want to shoot A.R., but he feared imminent death or serious bodily harm at A.R.'s hands. This fear extended to his family who were present at Spotlight. He also feared imminent death or serious bodily harm at UTMC.

**{¶ 45}** On cross-examination, Lathan testified that A.R. had threatened him face-to-face in the past when they were both at a bar called D'Icon. A.R. told Lathan he would "shoot this mother fucker up." Lathan denied that he had any problem with A.R. He also denied making a rap song talking about how he killed A.R. Lathan claimed that he always went out of his way to avoid A.R., even going to stores that were further away to avoid running into him.

**{¶ 46}** Lathan conceded that A.R. did not point the gun at him and did not try to shoot him when he was standing at the closest point to Lathan and would have had the easiest shot. He believes that A.R. was surprised to see him because he had previously been in a different spot. Lathan believes that they were also trying to set up E.W. He debated the suggestion that A.R. would not have shot in E.W.'s direction because E.W. was standing next to D.D.

**{¶ 47}** Lathan denied that A.R. had his back to him when he was shot. He described A.R. as being "slanted," looking back at him. He challenged the prosecutor's contention that sparks were not visible from A.R.'s gun. He said that if the recording is played slowly, sparks can be seen, but he conceded that on regular speed, they cannot. Lathan testified that people on the side of the maroon sedan, next to the Jeep, shot at him after he shot A.R.

{¶ 48} In a jailhouse phone call, Lathan denied shooting A.R. He explained that he said this because he was not legally allowed to possess a firearm and did not know that it would be legal for him to use a firearm in self-defense.

## C. The Verdict and Motion for New Trial

{¶ 49} The jury found Lathan guilty of murder and felonious assault, along with the specifications. Thirteen days later, on August 18, 2022, Lathan sought and was granted leave to file a motion for a new trial. He argued that one of the jurors—Juror #7—engaged in misconduct by failing to disclose that he knew defense counsel.

{¶ 50} According to Lathan's motion, on August 4, 2022, the wife of defense counsel came to court to watch her husband examine defense witnesses. On her way to the courtroom, she saw a man she had worked with between 2011 and 2014; she did not speak with him. When the jury was led into the courtroom, she realized that the man was seated as a juror on the case. She perceived that he was staring at her, which made her uncomfortable, so she left the courtroom and went home. After she left, her husband called her, and she explained that she left because she knew one of the jurors. She told her husband that she did not speak with the juror and did not know if the juror knew that she was married to defense counsel.

{¶ 51} The next day, defense counsel called his wife to tell her that the jury had found Lathan guilty. Soon after, Juror #7 direct messaged her on Facebook and said: "1st off it was nice to see you n 2nd husband did nice job for his first case 🤚🤚." She did not respond. She looked through her messages and saw that she and Juror #7 had

direct messaged on Facebook in 2018. He asked her opinion about a job opportunity and she gave him her advice. He responded "[a]re you taking bf apps and is it free lol[.]" She did not respond.

{¶ 52} Lathan argued that if he had known that Juror #7 had asked to apply to be defense counsel's wife's boyfriend and "had been rebuffed," he would have wanted Juror #7 removed from the jury. He acknowledged that at the time of voir dire, Juror #7 may not have known that he knew defense counsel's wife, but he knew on the third day of trial. Although Lathan's motion did not explicitly allege that Juror #7 was biased or impartial or that he failed to honestly answer questions during voir dire, he cited cases recognizing that a defendant is entitled to an impartial, unprejudiced, and unbiased jury, and that a new trial may be granted where a juror has failed to honestly answer material questions during voir dire.

{¶ 53} On December 5, 2022, Lathan filed a motion for disclosure of jury information, including the names, addresses, and employer information for each juror. The court denied the motion because it found that there had not been an initial showing of juror misconduct. The motion proceeded to a hearing on December 19, 2022, at which defense counsel testified.

{¶ 54} In a judgment journalized on January 18, 2023, the trial court denied Lathan's motion for new trial for two primary reasons: (1) prospective jurors were never asked if they knew any family members of the attorneys and defense counsel admitted that he had no cause to believe that the juror knew that defense counsel was married to a

17.

person the juror knew; and (2) defense counsel was informed by his wife before closing arguments of her connection to the juror, yet defense counsel did not bring the issue to the court's attention, suggesting to the court that counsel did not actually believe that Juror #7 could not be fair and impartial during deliberations.

{¶ 55} The court did not allow an additional hearing for Lathan to examine Juror #7 and the other jurors.

### D. Sentencing

{¶ 56} On January 19, 2023, the trial court sentenced Lathan. It found that Counts 1 and 2 merged for purposes of sentencing and sentenced him on Count 1. The court imposed a stated minimum prison term of 15 years to life and a mandatory consecutive term of three years on the firearms specification. On Count 3, the court imposed a prison term of 30 months to run consecutively to the sentence imposed for Count 1. Lathan's conviction and sentence were memorialized in a judgment journalized on January 20, 2023.

{¶ 57} Lathan appealed. He assigns the following errors for our review:

ASSIGNMENT OF ERROR I: The trial court erred in excluding relevant evidence of Mr. Lathan's self-defense claim, thereby violating his Sixth Amendment Right to a meaningful defense.

ASSIGNMENT OF ERROR II: Mr. Lathan's conviction was against the manifest weight of the evidence.

ASSIGNMENT OF ERROR III: The trial court erred in denying Mr. Lathan's Motion for New Trial.

## II. Law and Analysis

{¶ 58} In his first assignment of error, Lathan challenges the trial court's exclusion of a video recorded by the victim three months before the shooting, in which he allegedly rapped about his intent to kill Lathan. In his second assignment of error, he argues that the jury's verdict rejecting his claim of self-defense was against the manifest weight of the evidence. In his third assignment of error, Lathan argues that the trial court erred in denying his motion for a new trial. We consider each of Lathan's assignments in turn.

### A. Exclusion of Evidence

{¶ 59} On August 3, 2022—the evening before Lathan was set to begin presenting his case-in-chief—Lathan's counsel provided the State a copy of a rap video that A.R. allegedly posted online in February of 2021, which counsel said had just been found. In it, A.R. claimed to have committed several shootings and "specifically call[ed] Mr. Lathan out as a mark," warning him that he better kill A.R. before A.R. kills him. The State objected to the admissibility of the recording. It argued that it was not timely disclosed, was unfairly prejudicial, and contained exaggerations intended for entertainment purposes. The trial court ruled that Lathan could testify about the rap video, but it could not be admitted into evidence or played at trial because it had not been disclosed in accordance with Crim.R. 16. In his first assignment of error, Lathan argues that the trial court erred when it excluded this evidence.

19.

{¶ 60} In support of this assignment of error, Lathan contends that (1) the video was admissible as a specific instance of A.R.'s threat to kill him and was probative to establish his subjective fear of A.R.; and (2) the trial court failed to engage in the proper analysis before excluding the evidence and failed to impose the least restrictive sanction for Lathan's discovery violation. In response, the State does not dispute the relevance of the video, but argues that (1) it was within the trial court's discretion to exclude the evidence; (2) the trial court engaged in the proper analysis before excluding the video; and (3) Lathan suffered no prejudice because he was permitted to testify "to anything and everything" contained in the video.

{¶ 61} The way this issue materialized at trial was as follows. On August 3, 2022, the third day of trial, the State rested, Lathan moved for acquittal, and the trial court denied the motion. At some point that day—the record does not make clear when—Lathan's attorneys alerted the State and the court that it had received an electronic transmission of a video posted by A.R. in February of 2021. The parties apparently provided case law to the trial court concerning the admissibility of that video. On August 4, 2022, the parties argued their positions to the court.

{¶ 62} Lathan argued that the case law makes clear that in a self-defense case, prior acts and threats made by the victim, which are known to the defendant, are admissible to show the defendant's subjective belief of imminent death or serious bodily harm. The State responded that Lathan filed his motion of intent to assert self-defense in July of 2022, the video was published on YouTube and not in some secret forum, and

20.

because of its late disclosure, the video should not be admitted. It commented that if the *State* had attempted to introduce evidence that was publicly available but not previously disclosed, it doubted the court would allow its introduction. It also complained that there were never any actual acts of violence by A.R. against Lathan, there were other aspects of the video (e.g., guns) that may inflame the jury or cause them to "automatically assume bad things about [A.R.'s] character," and the video likely contained exaggerations intended to entertain.

{¶ 63} Lathan replied that the video specifically threatened violent acts against him, and A.R. admitted to other shootings that Lathan believes happened, Lathan was aware of other instances of violence by A.R., A.R. had a reputation for violence, and all these facts supported Lathan's subjective belief that lethal force was necessary. He pointed out that the State had sought to use jailhouse phone calls that were not previously disclosed, and he explained that the video was filed under a unique name that was not the victim's given name or widely-known nickname. Even though Lathan knew of the existence of the video, he could not remember the name needed to find the video; defense counsel, by surprise, received a direct link to the video by an unknown third party. Finally, because the State was aware from other witnesses that there was a "rap beef" between Lathan and A.R., the State should not have been surprised by the video.

{¶ 64} The court agreed that *testimony* about the rap video was admissible, but it ruled that "the video is not coming in" under Crim.R. 16 because of its late disclosure. It observed that Lathan knew about the video and could have searched for it, and it found

21.

that the way the video came to the attention of defense counsel was "curious." The court disagreed with Lathan that the video was comparable to jailhouse phone calls, and it agreed with the State that if the State had attempted this tactic and the evidence was allowed, the decision would surely be reversed on appeal. The court told the attorneys that they were not going to engage in "trial by ambush," and it reiterated that Lathan could testify about the video, but it would not be played.

{¶ 65} Generally speaking, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Here, however, the trial court did not exclude the evidence under the Rules of Evidence—it excluded the evidence under the Rules of Criminal Procedure because of the failure to timely disclose the evidence. The State does not dispute the relevance of the rap video or argue that it should have been excluded under Article IV of the Rules of Evidence. We focus our attention, therefore, on the authority of the trial court to exclude the evidence under the Rules of Criminal Procedure.

{¶ 66} Under Crim.R. 16(H), if a defendant serves a written demand for discovery seeking disclosure of evidence from the State, "a reciprocal duty of disclosure by the defendant arises without further demand by the state." The rule requires the defendant to provide copies of certain materials "intended for use by the defense as evidence at the trial." *Id.* Crim.R. 16(L)(1) permits the trial court to "make orders regulating discovery,"

22.

and if "at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule . . . the court may . . . prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Imposition of discovery sanctions is discretionary, and we review the trial court's decision for an abuse of discretion. *State v. Darmond*, 2013-Ohio-966, ¶ 20, 33. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

{¶ 67} Also pertinent here, Crim.R. 12.2—adopted effective July 1, 2022—requires a defendant who proposes to offer evidence or argue self-defense "not less than thirty days before trial . . . [to] give notice in writing of such intent" and to "include specific information as to any prior incidents or circumstances upon which defendant intends to offer evidence related to conduct of the alleged victim . . . ." The rule requires the defense to notify the State "of evidence that the defense may offer in support of his self-defense claim." *State v. Watson*, 2023-Ohio-3137, ¶ 44 (5th Dist.). If a defendant fails to do so, "the court may exclude evidence offered by the defendant related to the defense, unless the court determines that in the interest of justice such evidence should be admitted." Crim.R. 12.2. As with Crim.R. 16, this is a matter of discretion for the trial court.

{¶ 68} The Ohio Supreme Court has recognized that "[t]he philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial." *State v.*

23.

*Howard*, 56 Ohio St.2d 328, 333 (1978). The discovery rules are intended to "prevent surprise and the secreting of evidence favorable to one party . . . [and] to produce a fair trial." *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987). Those rules provide a range of sanctions that the trial court, in its discretion, may impose on a noncomplying party. *Id.* at 4.

{¶ 69} In *Papedelis*, the Court provided guidance for courts in exercising their discretion under Crim.R. 16. It cautioned that under some circumstances, "the sanction of exclusion may infringe on a criminal defendant's Sixth Amendment right to present a defense[.]" *Id.* at 5. For instance, a defendant's Sixth Amendment right may be infringed where all his witnesses are excluded from testifying. *Id.* Cognizant of this concern, the Court held "that a trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Id.* at 5. "Factors to be considered by the trial court include the extent to which the prosecution will be surprised or prejudiced by the witness' testimony, the impact of witness preclusion on the evidence at trial and the outcome of the case, whether violation of the discovery rules was willful or in bad faith, and the effectiveness of less severe sanctions." *Id.*

{¶ 70} Importantly, however, the Court emphasized that its holding "should not be construed to mean that the exclusion of testimony or evidence is never a permissible sanction in a criminal case." *Id.* Rather, "[i]t is only when exclusion acts to completely

24.

deny defendant his or her constitutional right to present a defense that the sanction is impermissible." *Id.*

{¶ 71} In *State v. Pettway*, 2004-Ohio-4499 (8th Dist.), the defendant attempted to introduce into evidence the victim's personal journals to impeach her testimony and explain her state of mind. The trial court excluded the evidence because it had not been disclosed before trial. The court of appeals affirmed. It recognized that the defendant had a duty to disclose the evidence to the State prior to trial. It concluded that because he failed to do so, the trial court did not err in excluding the journals. *Id.* at ¶ 15.

{¶ 72} Like Lathan, the defendant in *Pettaway* argued that "even if the court was correct in ruling that the journals were subject to pretrial discovery, exclusion of the journals was not the least restrictive sanction the trial court could have imposed." *Id.* at ¶ 16. The court acknowledged that the court could have imposed less restrictive sanctions, but it found that the defendant bore the burden of requesting a less severe sanction, and he failed to do so, thereby waiving the argument. It also concluded that even considering the argument, "the trial court has broad discretion in imposing a sanction consistent with the circumstances of the case," and it found no abuse of that discretion. *Id.* at ¶ 20.

{¶ 73} Here, the trial court reviewed the case law and considered the purposes of Crim.R. 16, the circumstances that Lathan claimed had prevented him from disclosing the evidence in discovery, and the extent to which the presentation of Lathan's defense would be impacted by exclusion of the evidence. It agreed that Lathan "certainly" would be allowed to testify about the rap video and anything in the past that caused him to

25.

believe that his life was in danger, but at the same time, it was skeptical that the video could not have been produced earlier given Lathan's knowledge of its existence. As such, it excluded the video, but specifically permitted Lathan to "talk about everything that was said in it if he wants to." But Lathan was specifically permitted to testify about the contents of the video, thus exclusion of the video did not prevent him from presenting a defense. *Compare Papadelis,* 32 Ohio St.3d at 4 (observing that the effect of the sanction of excluding Papadelis's defense witnesses was to deny Papadelis the right to present a defense).

{¶ 74} Lathan emphasizes that the video would have bolstered his defense because it was independent evidence that he had reason to fear imminent death or serious bodily harm by A.R. Perhaps this is true—the video is not part of the record, so we are unable to agree or disagree with Lathan on that point. What we can say is that Lathan was apparently aware of the existence of this video for at least 15 months before trial, and it was incumbent on him to locate it in time to make pretrial disclosure of it. His disclosure of it after the State rested was contrary to the purpose of Crim.R. 16, and it violated Crim.R. 12.2. Based on the record before us, we cannot say that the trial court abused its discretion by excluding the video as a Crim.R. 16 sanction.

{¶ 75} We find Lathan's first assignment of error not well-taken.

26.

## B. Manifest Weight of the Evidence

{¶ 76} In his second assignment of error, Lathan argues that his conviction is against the manifest weight of the evidence because the record clearly supported his claim that he shot A.R. in self-defense.

{¶ 77} Under R.C. 2901.05(B)(1), "[a] person is allowed to act in self-defense . . . ." A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. *State v. Messenger,* 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "[T]the second element of self-defense is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). And under the most recent amendments to R.C. 2901.09(B), with respect to the third element, "a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." *State v. Lane*, 2023-Ohio-1305, ¶ 14-15 (6th Dist.).

{¶ 78} Self-defense is an affirmative defense—not an element of a crime. *Messenger* at ¶ 24. "R.C. 2901.05(B)(1) triggers the State's duty to disprove self-defense so long as 'there is evidence presented that tends to support that the accused person used the force in self-defense.'" *Id.* at ¶ 20, quoting R.C. 2901.05(B)(1). As such, "a defendant charged with an offense involving the use of force has the burden of producing

27.

legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. Where that duty is triggered, "a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26.

{¶ 79} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 80} Lathan argues that the jury lost its way in rejecting his claim of self-defense. First, he argues that he was not at fault for creating the situation. He went to Spotlight that night not knowing that A.R. would be there. He emphasizes that A.R. put his mask down, took a loaded gun out of his fanny pack, cocked the gun, and walked closer to Lathan, thereby escalating the situation.

{¶ 81} Second, Lathan argues that he had a bona fide belief that he was in imminent danger and needed to use force. He maintains that both the State and the

28.

defense agreed that there was a "beef" between A.R. and Lathan, so much so that D.D. claimed that A.R. felt compelled to leave and D.G. testified that he sensed tension. Lathan testified about death threats made by A.R. in the rap video, on social media, and to Lathan personally. Moreover, A.R. had a reputation for shooting people and the night of the shooting, people in the parking lot told Lathan that A.R. was going to shoot up the vehicle. Lathan wanted to leave Spotlight, but his car was blocked in because of the traffic in the crowded parking lot. And A.R. walked directly towards Lathan, masked and carrying a loaded gun. Lathan claimed that A.R. raised his gun in Lathan's direction and peeked back at him, causing Lathan to believe that he needed to shoot A.R. before A.R. shot him, his friends, or his family. Lathan acknowledges that the fatal shot was fired into A.R.'s back, but he argues that this does not diminish his claim of self-defense.

{¶ 82} Finally, Lathan insists that he had no duty to retreat because he was lawfully entitled to be in the parking lot at Spotlight Lounge.

{¶ 83} The State responds that while Lathan and A.R. were not friends, there was no evidence of any prior altercations between them. It emphasizes that A.R. was shot in the back, not in the chest, and A.R. had a clear shot of Lathan when he walked to the front of the car, but did not shoot when he had a better opportunity to do so. The State also highlights the fact that Lathan led the police on a chase, reaching speeds of 98 miles per hour, then fleeing on foot when he crashed into a rock. It insists that this is not the exceptional case where the evidence weighs heavily against conviction. Rather, credible evidence, including witness testimony and video exhibits, supports the jury's verdict.

29.

{¶ 84} Here, the jury had before it two versions of events. Under the State's version of events, Lathan went to Spotlight Lounge with a gun in his possession; A.R. did not shoot Lathan despite having a clear shot at him; A.R. had his back to Lathan and was shot in the left side of his back and in the back of his right leg, demonstrating that his back was to Lathan; A.R. did not raise his gun to fire at Lathan; Lathan fled and led police on a chase, at times driving 98 miles per hour; and Lathan stated in a jailhouse phone call that he did not shoot A.R., undermining his claim of self-defense.

{¶ 85} Under Lathan's version of events, he did not know that A.R. would be at Spotlight when he and his friends and brother decided to go there that night; A.R. created a rap video months earlier threatening Lathan's life; Lathan was aware that A.R. had shot others and believed that A.R. would shoot him; Lathan feared A.R. and tried to leave when he saw him at Spotlight, but was trapped in the line of cars in the crowded parking lot; Lathan did not go to Spotlight with a gun, but an unknown person slipped a gun to him; Lathan was warned that A.R. was about to shoot up his car; D.G. perceived the tension when Lathan got to Spotlight; Lathan saw A.R.'s friends positioned with guns; A.R. put a mask over his face, cocked his gun, walked toward A.R., lifted his gun, and fired; A.R. was slanted toward Lathan when Lathan fired the gun and the shot was to A.R.'s side, near his armpit, rather than to his back; Brown Hat, D.D., and A.R. signaled to each other as part of a plan to shoot Lathan and his friends and brother; A.R. and others fired guns in addition to those fired by Lathan and D.D.; and Lathan fled police not

30.

because he had shot A.R., but because he had a weapon in his possession when he believed he was legally prohibited from having one.

{¶ 86} In addition to the testimony from prosecutors and defense witnesses, video recordings were provided for the jury. Those videos were subject to interpretation. Excerpts were zoomed in or slowed down and did not necessarily reflect how the participants and witnesses at the scene may have perceived the incident in real time. Some camera angles may have supported Lathan's description of the events, while other angles seemed to support the State's narrative. The jury considered all this evidence and ultimately found the State's version of events more credible. Although under a manifest-weight standard we consider the credibility of witnesses, we must extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). Under the facts and evidence presented in this case, we cannot conclude that the jury clearly lost its way in resolving evidentiary conflicts in favor of the State, thereby rejecting Lathan's claim of self-defense.

{¶ 87} We find Lathan's second assignment of error not well-taken.

### C. Motion for New Trial

{¶ 88} On August 18, 2022, Lathan filed a motion for a new trial. He claimed that he was entitled to a new trial because Juror #7 failed to disclose that he knew defense

31.

counsel's wife and had made advances toward her that were rejected, purportedly leading him to hold bias toward Lathan. The trial court denied Lathan's motion, finding that he had failed to show that Juror #7 engaged in any misconduct. In his third assignment of error, Lathan argues that the trial court erred when it denied his motion.

{¶ 89} As previously summarized, defense counsel's wife attended trial on the day her husband presented Lathan's defense. She left soon after realizing that she knew one of the jurors, with whom she had worked sometime between 2011 and 2014. Defense counsel called his wife before closing arguments to ask why she had left, and she told him. They talked about it more when he got home. She told her husband that she believed the juror was staring at her and it made her uncomfortable.

{¶ 90} Around 5:00 p.m. the next day, the jury delivered its guilty verdict. About an hour later, the juror messaged defense counsel's wife and said it was good to see her and that her husband had done a good job for his first trial. At that time, she viewed previous messages from the juror. He had last messaged her four years earlier, in 2018, seeking career advice. After she provided her advice, he asked her if she was accepting boyfriend applications. Defense counsel's wife did not respond to the comment about the boyfriend applications, and she did not hear from him again until he sent the message after the trial. Notably, defense counsel and his wife were not married or dating in 2018, when the juror sent the message about boyfriend applications.

{¶ 91} Thirteen days after the verdict was rendered, Lathan filed a motion for new trial under Crim.R. 33, attaching affidavits from defense counsel and his wife. Lathan

32.

did not specify which provision of Crim.R. 33 he was relying on, but he claimed that because defense counsel was "the husband of the woman who rejected his advances," the juror held enmity or bias toward the defense. He claimed that he would have challenged the juror for cause if he had known that the juror and defense counsel's wife were acquainted.

{¶ 92} The court set the matter for hearing at which defense counsel testified. In a judgment journalized on January 18, 2023, the court denied Lathan's motion. It interpreted the motion as a motion for new trial under Crim.R. 33(A)(2), which provides for the possibility of a new trial on the basis of jury misconduct. It found that Lathan had failed to show that there had been any misconduct by the juror because prospective jurors had not been asked if they knew any family members of the attorneys, and defense counsel conceded that he had no reason to believe that Juror #7 knew that counsel was married to a woman he knew. Moreover, it observed that defense counsel must not have been concerned that Juror #7 could not be fair and impartial because despite having been told by his wife of her connection to Juror #7, he did not advise the court of any concern despite opportunity to do so.

{¶ 93} Although the trial court decided Lathan's motion under Crim.R. 33(A)(2), Lathan argues on appeal that he was entitled to a new trial under Crim.R. 33(A)(6), which permits a trial court to grant a motion for new trial where the defendant has discovered new evidence material to the defense which the defendant could not with reasonable diligence have discovered and produced at the trial. He argues that the information about

33.

the juror's connection with defense counsel's wife was new evidence that could not have been produced before conviction because the juror "did not disclose the connection until after the verdict was rendered." Lathan claims that further investigation was needed to determine if Juror #7 failed to disclose at voir dire his connection to defense counsel's wife. He maintains that the trial court should have allowed him to question Juror #7 and the other jurors to determine whether their deliberations were affected by Juror #7's connection with defense counsel's wife.

{¶ 94} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. "In reviewing circumstances suggesting juror misconduct, an appellate court must conduct a two-tier analysis: (1) determine whether there was juror misconduct and (2) if juror misconduct is found, determine whether it materially affected the defendant's substantial rights." *State v. McGail*, 2021-Ohio-231, ¶ 27 (2d Dist.). Whether brought under Crim.R. 33(A)(2) or (6), "an appellate court reviews the denial of a motion for a new trial for an abuse of discretion." *State v. Williams,* 2014-Ohio-2834, ¶ 62 (6th Dist.); *State v. Edwards*, 2019-Ohio-3012, ¶ 52 (10th Dist.).

34.

{¶ 95} As an initial matter, Juror #7's possible connection to defense counsel is not "evidence" material to the issues at trial. Accordingly, Lathan's motion is properly analyzed under Crim.R. 33(A)(2), not (A)(6).

{¶ 96} A juror's concealment of information during voir dire may be deemed misconduct, but to warrant a new trial, the defendant must demonstrate that the juror was not impartial. *State v. Hughes*, 2003-Ohio-6094, ¶ 11 (7th Dist.). "A court may infer bias if it finds deliberate concealment, however, if the concealment was unintentional, the defendant must show that the juror was actually biased." *Id.*

{¶ 97} Having reviewed the transcripts from voir dire and from the hearing on the motion for new trial, we agree with the trial court that Juror #7 did not conceal information during voir dire. The prospective jurors were not asked during voir dire if they knew any of the attorneys' family members. Moreover, defense counsel testified that he asked his wife "would he know that I'm your husband," and she said "probably not." To obtain a new trial in a case in which a juror has not disclosed information during voir dire, the moving party must first demonstrate that a juror failed to answer honestly a material question on voir dire . . . ." *Grundy v. Dhillon*, 2008-Ohio-6324, paragraph one of the syllabus. Here, Lathan cannot show that Juror #7 failed to provide an honest answer to a material question.

{¶ 98} We also agree with the trial court that the timeline of events indicates that defense counsel knew before the verdict that there existed a connection between his wife and Juror #7, yet he waited to alert the trial court and examine the issue until after a

35.

verdict was rendered. If there was a legitimate concern about Juror #7's potential bias against Lathan, it could have been raised when defense counsel's wife told her husband that she knew the juror and that the juror had stared at her, making her feel uncomfortable. Upon being told by his wife that she and Juror #7 were acquainted, it was incumbent on defense counsel to bring this to the court's attention so that it could ensure that deliberations would not be affected by Juror #7's connection to defense counsel's wife. He failed to do so.

{¶ 99} Because Juror #7 did not conceal or provide dishonest information during voir dire and defense counsel did not raise any concern with the trial court before the verdict was rendered, we find that the trial court did not abuse its discretion in denying Lathan's motion for a new trial under Crim.R. 33(A)(2).

{¶ 100} We find Lathan's third assignment of error not well-taken.

### III. Conclusion

{¶ 101} Based on the record before us, we cannot say that the trial court abused its discretion under Crim.R. 16 and 12.2 when it excluded from evidence a recording offered by Lathan that was not disclosed until after the State rested its case. We find Lathan's first assignment of error not well-taken.

{¶ 102} The jury's decision to reject Lathan's claim of self-defense did not render Lathan's conviction against the manifest weight of the evidence. The jury did not clearly lose its way in resolving credibility determinations in favor of the State. We find Lathan's second assignment of error not well-taken.

36.

**{¶ 103}** Juror #7 did not fail to disclose information requested in voir dire; prospective jurors were not asked if they knew any family members of the attorneys. Additionally, defense counsel waited to raise concerns about the juror's potential bias until after the verdict was rendered, despite being aware before closing arguments that the juror had a connection to his wife. The trial court properly denied Lathan's motion for new trial under Crim.R. 33(A)(2). We find Lathan's third assignment of error not well-taken.

**{¶ 104}** We affirm the January 20, 2023 judgment of the Lucas County Court of Common Pleas. Lathan is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                   _____
                                                JUDGE

Christine E. Mayle, J.            

                                     _____

Myron C. Duhart, J.                                             JUDGE
CONCUR.

                                     _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.