[Cite as *State v. Coutcher*, 2024-Ohio-4721.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-23-1214

    Appellee                                 Trial Court No.  CR0202202531

v.

Bryan M. Coutcher                         **DECISION AND JUDGMENT**

    Appellant                                Decided:  September 27, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Bryan Coutcher appeals the judgment of the Lucas County Court of Common Pleas convicting him, following a jury trial, of one count of murder and one count of felonious assault.  Because the convictions are not against the manifest weight of the evidence, the trial court's judgment is affirmed.

# I. Factual Background and Procedural History

{¶ 2} In the early morning hours of August 12, 2022, Toledo Police were dispatched to Coutcher's residence at 2225 North Erie St. in Toledo, Lucas County, Ohio. There, they found the victim B.S. unconscious and bleeding from her head in an alley behind the house. B.S. succumbed to her injuries 17 days later.

{¶ 3} On September 8, 2022, the Lucas County Grand Jury returned a three-count indictment against Coutcher, charging him with one count of murder in violation of R.C. 2903.02(A), one count of murder in violation of R.C. 2903.02(B), and one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D). The matter proceeded to a three-day jury trial at which the following evidence was presented.

{¶ 4} Shortly after midnight on August 12, 2022, Toledo police officers Lucas Freels and Jerome Pierce responded to Coutcher's address. Upon arriving, they met Coutcher at the entrance to an alleyway on the right side of his house. He led them down the alley to where it intersected with another alley coming from the left that ran along the back of his house. Along the way, Coutcher pointed out obscenities that had been spray painted onto his house and garage.

{¶ 5} Turning left into the alley that ran behind the house, the officers noticed a woman dressed in dark clothing lying on the ground on the left side of the alley, next to a privacy fence behind 2221 North Erie St. The woman was unresponsive and was bleeding profusely from her head. Coutcher identified her as B.S., a friend of his ex-

2.

girlfriend, and someone he claimed had a history of vandalizing his property. B.S. received treatment on the scene, then was transported to the hospital where she later died.

{¶ 6} Across the alley, on the right side amongst the weeds and brush, was a white Ford Escape that was still running and in gear, but which had come to a stop against a large bush or small tree. The driver's door handle had blood on it, which DNA testing confirmed belonged to B.S. Y-STR DNA consistent with Coutcher was also found on the door handle. Inside, the dashboard and touchscreen display were smashed. On the front passenger seat was a crowbar, a pair of bolt cutters, and a plastic bag containing two cans of spray paint. B.S.'s DNA was present on the curved end of the crowbar, while Y-STR DNA consistent with Coutcher was present on both the curved and the straight ends of the crowbar. Approximately 50 feet from the vehicle, near the intersection of the two alleys, officers found B.S.'s dentures.

{¶ 7} The responding officers spoke with Coutcher at the scene, and their body-worn-camera videos were played for the jury. When the officers first arrived, Coutcher claimed that B.S. tried to attack him with a crowbar and all he did was hit her back with it, "no force intended." He stated that he has reported B.S. multiple times recently for vandalizing his motorcycle and painting obscenities on his home.

{¶ 8} After medics took over caring for B.S., Coutcher spoke with Toledo Police Officer Lucas Freels and told him that he arrived home that night and saw something happening in the back. When he went around, B.S. came out with the crowbar and tried to hit him with it. He then "bumped" her with the crowbar, the crowbar went back in the

3.

truck, B.S. fell to the ground, and then Coutcher called the police. Coutcher said that when he confronted her, B.S. was driving the vehicle and she jumped out while it was still in gear. The vehicle then continued to move until it came to a stop in the brush. In response to Freels' attempt to clarify the order of events, Coutcher claimed that B.S. hit him on his left shoulder with the crowbar and then he took it from her and "bumped" her in the head with it just once. Freels examined Coutcher's shoulder and did not see any signs of injury.

{¶ 9} Coutcher also spoke with Toledo Police Officer Jerome Pierce. He told Pierce that the crowbar probably hit B.S. twice as he was trying to grab it from her. He stated that B.S. was his "best friend's mom," and he would not try to hurt her.

{¶ 10} Coutcher was then taken to the Toledo Police Safety Building where he was interviewed by Detective Michael Murphy. He told Murphy that he came home and saw lights behind his house. As soon as he went back to check it out, B.S. was getting into her vehicle when she came at him with a crowbar. He pushed the crowbar back at her and hit her, she then hit him in the shoulder with it, then he pushed it back at her and hit her again. After the second hit, B.S. threw the crowbar in the truck, which was still rolling, and then she fell to the ground. Coutcher claimed that he never took the crowbar from her.

{¶ 11} On further questioning, Coutcher said that when he first went back, B.S. was getting into the vehicle and it was still in gear. Murphy asked how the vehicle could be in gear if B.S. was getting into it, to which Coutcher said he did not know if she was

4.

getting ready to leave, but when she got out the vehicle kept moving forward slowly. Murphy also confronted Coutcher with his statements to the responding officers at the scene that he put the crowbar back in the truck, and Coutcher replied that when B.S. hit him the second time, the crowbar fell into the truck and he threw the truck into park. He said that it all happened so fast, but he insisted that he did not beat B.S. with the crowbar.

{¶ 12} After B.S. died on August 29, 2022, Dr. Thomas Blomquist performed an autopsy on her during which he initially observed a two-inch laceration on the left side of her head that was healing. His examination revealed that B.S. suffered a depressed left skull fracture. According to Blomquist, "You don't get this type of fracture where it's depressed and the outer plate of the bone is pushed in by just falling down and hitting your head, even on concrete. It won't create a depressed skull fracture like this." He then testified that B.S. had subarachnoid damage on both sides of the brain. He explained that she was hit in the head hard enough that it caused her brain to shift and hit the opposite side of her skull, resulting in the additional injury on the right side. Blomquist said that this type of injury would typically be seen in a motor vehicle accident where the person was not wearing a seatbelt, noting that these injuries require "a significant amount of force."

{¶ 13} As a result of her head injury, B.S. never regained consciousness. Ultimately, her immobility in the hospital caused blood clots to form, which went to her lungs and killed her.

5.

{¶ 14} James Ball also testified for the State.  Ball was an inmate with Coutcher at the Lucas County Jail.  He had an extensive criminal history and was currently being held in jail on pending felony charges for theft, robbery, having weapons under disability, and possession of drugs.  In exchange for his truthful testimony, the State agreed to recommend drug treatment at Ball's sentencing.

{¶ 15} Ball testified that while they were housed together, Coutcher bragged about killing B.S.  He relayed that "[Coutcher] told me that he came home and she was in the back of the house, sitting in her SUV, and he snatched her out of the car and cracked the bitch upside the head with the crowbar.  And told me she died a week or so later, and that he was glad she did because she had been a thorn in his side and he was going to kill the bitch anyway."  Ball noted that Coutcher was the one who used the term "bitch."

{¶ 16} Upon hearing this, Ball determined that he was going to help himself.  So, he reached out to his attorney and later the prosecutor to report what Coutcher had said.  He testified that he never saw Coutcher's case file, that he had no reason to lie, and that he had no problem with Coutcher other than he did not like that Coutcher was bragging about killing B.S.  On cross-examination, Ball admitted that he sometimes forgets what he has for breakfast, but he stated that he is pretty good at remembering the important things.

{¶ 17} Finally, the State called Toledo Police Detective Paul Marchyok as its last witness.  Marchyok testified that he received a letter from Coutcher asking him to investigate certain instances of B.S.'s misconduct.  Marchyok looked into Coutcher's

6.

allegations of vandalism and spoke with B.S.'s friend and Coutcher's ex-girlfriend. Marchyok learned that Coutcher and B.S. hated each other and B.S. likely was spray painting Coutcher's property on the night of the incident.

{¶ 18} Marchyok also testified that Coutcher's explanation of the events did not match the evidence from the scene. He noted that the presence of the dentures near the intersection between the alleys and the tire tracks and path of the SUV into the bushes and tree where it stopped while still running and in gear were much more consistent with Ball's version that Coutcher snatched B.S. out of the vehicle. Further, Marchyok stated that there was no evidence that B.S.'s body moved after she was hit by the crowbar, thus the only way her blood could have gotten on the door handle was if Coutcher transferred it there, which would also explain the presence of his Y-STR DNA on that handle. In addition, he indicated that Coutcher's explanation of how the crowbar got back into the vehicle did not make any sense.

{¶ 19} Following the State's presentation of evidence, Coutcher moved for an acquittal pursuant to Crim.R. 29(A), which the trial court denied. He then testified in his own defense.

{¶ 20} Coutcher testified that on the evening of August 11, 2022, he was with some friends drinking and socializing. When he returned to his home shortly after midnight, he heard dogs barking behind his house and he saw the flicker of a taillight in the back alley. He went to investigate. It was very dark in the alley when he saw a shadow come right at him and a crowbar came down to strike him. He testified that he

7.

just moved his head and the crowbar hit him in the shoulder.  The person was wearing a mask, a black hoodie, and black pants.  The blow to the shoulder hurt and left a big bruise the next day.  Coutcher testified that he "literally feared for [his] life."  He thought "for sure it was a man, or, you know a bigger man coming at me with a crowbar to kill me.  That's all I could think of."

{¶ 21} The assailant then hit Coutcher again.  That is when he grabbed the crowbar and they fought for control of it.  As they were scuffling, Coutcher pushed it back "to try to save my life, to try to, you know, to try to keep from getting hit again, and getting hurt again, I grabbed it and I forced it to their head."  Finally, Coutcher spun around "and forced it to them again, and that's when they fell and I dropped the crowbar, they dropped the crowbar at the same time."

{¶ 22} After the assailant fell, Coutcher pulled the mask down and saw that it was B.S.  Shocked, he grabbed the crowbar, went to the SUV, opened it, and looked in and saw the spray paint and the bolt cutters.  When he saw those items, he got angry because of the vandalism, the attempts to break in, and the fact that she just tried to kill him, so he busted the vehicle's dashboard.  He testified that he then set the crowbar down and told B.S. not to worry and that he was going to get her help.  He returned to the house and found a phone that worked and called 911.  Coutcher declared that it all happened within a few seconds in the pitch black and he swore that he did not mean to hurt anyone.

{¶ 23} Following Coutcher's testimony, the defense rested without calling any additional witnesses.  The jury then deliberated and returned with a verdict of guilty on

8.

the count of murder in violation of R.C. 2903.02(B) and the count of felonious assault. The jury found Coutcher not guilty on the count of murder in violation of R.C. 2903.02(A).

**{¶ 24}** At sentencing, the trial court merged the offenses of murder and felonious assault, with the State electing to proceed to sentencing on the count of murder. The trial court then ordered Coutcher to serve the mandatory term of 15 years to life in prison.

## II. Assignment of Error

**{¶ 25}** Coutcher timely appeals his judgment of conviction, asserting one assignment of error for review:

> 1. The jury's verdict was against the manifest weight of the evidence presented at trial.

## III. Analysis

**{¶ 26}** In his assignment of error, Coutcher argues that the jury's verdict that he did not act in self-defense was against the manifest weight of the evidence. He does not otherwise challenge the elements of his conviction.

**{¶ 27}** "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *State v. Messenger*, 2022-Ohio-4562, ¶ 25. To be entitled to use deadly force, the defendant must demonstrate that "(1) he was not at fault in creating the situation that led to the affray; (2) he had a 'bona fide belief' that he was 'in imminent danger of death or great bodily harm' and his only way to escape was by using force; and

9.

(3) he did not violate a duty to retreat." *State v. Palmer*, 2024-Ohio-539, ¶ 23, quoting

*Messenger* at ¶ 14; *State v. Wilson*, 2024-Ohio-776, ¶ 20; *State v. Barnes*, 94 Ohio St.3d

21, 24 (2002). "This burden of production is 'not a heavy one and * * * might even be

satisfied through the state's own evidence." *Id.* at ¶ 20, quoting *Messenger* at ¶ 22.

{¶ 28} The State concedes, in this case, that Coutcher has satisfied his initial

burden of production on the issue of self-defense. The burden thus shifts to the State to

prove beyond a reasonable doubt that Coutcher did not use the force in self-defense. *See*

R.C. 2901.05(B)(1) ("If, at the trial . . . there is evidence presented that tends to support

that the accused person used the force in self-defense, . . . the prosecution must prove

beyond a reasonable doubt that the accused person did not use the force in self-

defense[.]"); *Messenger* at ¶ 16; *State v. Lathan*, 2024-Ohio-2514, ¶ 78 (6th Dist.).

{¶ 29} The State's "burden of disproving the defendant's self-defense claim

beyond a reasonable doubt is subject to a manifest-weight review on appeal." *Messenger*

at ¶ 27. When reviewing a manifest weight claim, "[t]he court, reviewing the entire

record, weighs the evidence and all reasonable inferences, considers the credibility of

witnesses and determines whether in resolving conflicts in the evidence, the jury clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered." *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "The discretionary power to grant a new trial

should be exercised only in the exceptional case in which the evidence weighs heavily

against the conviction." *Id.*, quoting *Thompkins* at 387.

10.

{¶ 30} Oftentimes, a manifest-weight review of self-defense will examine whether it was warranted under a particular set of facts. Here, however, this court is presented with the more foundational question of what factually occurred. The jury was presented with two different theories. In the first, Ball testified that Coutcher bragged that he "snatched" B.S. out of the car and hit her with the crowbar. In the second, Coutcher testified that an unknown, masked assailant attacked him in the dark with a crowbar and he fought back. Under the first theory, Coutcher would not have acted in self-defense because he was the aggressor and did not have a bona fide fear that he was in imminent danger of death or great bodily harm. Under the second, he would have such a bona fide fear.

{¶ 31} Upon review, the evidence supports the first theory and the jury's conclusion that Coutcher did not act in self-defense. B.S.'s dentures were found fifty feet from her body, near the intersection of the two alleys. Coutcher's version of the events offers no explanation for how her dentures came to be at that location, whereas it could be consistent with him snatching her out of the vehicle. The vehicle was also still running and in gear, having rolled off the alley and to a stop against some shrubbery. This is consistent with a driver being taken from the vehicle. It is less believable that the driver would jump out of a moving vehicle to assault Coutcher instead of just driving away.

{¶ 32} In addition, B.S. suffered significant trauma to her head. Dr. Blomquist testified that her injuries would not have been caused by a force equal to a fall onto

11.

concrete, instead it required a greater amount of force akin to a car crash while not wearing a seatbelt. This is consistent with a violent attack, not a bump or a shove as Coutcher described. And while Coutcher claimed that B.S. hit him in the shoulder with the crowbar, Officer Freels observed no marks or injuries on Coutcher.

{¶ 33} Coutcher also testified that he left the crowbar in the vehicle after he angrily smashed the dashboard. This is probably true. But his testimony is inconsistent with his statements to the officers on the night of the attack where he varyingly described that B.S. placed the crowbar back into the vehicle or that it fell into the vehicle, both of which were impossible since there were no blood drops or other evidence to suggest that B.S. moved from the spot where she was struck and fell, which was at least 10 feet away from the vehicle on the other side of the alley. Coutcher's lies to the officers indicate that he knew he did something wrong.

{¶ 34} Finally, despite testifying that he was shocked when he removed his attacker's mask and discovered that it was B.S., and despite indicating some concern for her when he testified that he told her not to worry and that he was going to get help, his behavior and statements on the night of the attack contradict his claims. On that night, Coutcher was focused on the vandalism of his property, which he knew was done by B.S., not on her injuries. When asked by the 911 operator if anyone needed medical help, Coutcher continued to complain that B.S. spray painted his garage and stabbed the seat of his motorcycle. It was only when the operator asked a second time if anyone needed medical help that he responded, "Oh yeah, you better hurry up and get her." Likewise,

12.

when officers arrived, Coutcher pointed out the vandalism to his garage and did not immediately direct them to B.S. when they turned the corner down the back alley.

{¶ 35} When considering all the evidence, this is not the exceptional case where the jury clearly lost its way and committed a manifest miscarriage of justice when it found beyond a reasonable doubt that Coutcher did not act in self-defense.

{¶ 36} Therefore, Coutcher's conviction is not against the manifest weight of the evidence, and his assignment of error is not well-taken.

### IV. Conclusion

{¶ 37} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Coutcher is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.         _____
                                       JUDGE

Gene A. Zmuda, J.        

                                   _____
Charles E. Sulek, P.J.                                 JUDGE
CONCUR.

                                   _____
                                       JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.